The NEW SILVER BELL MINING COMPANY, a Montana Corporation, Plaintiff and Appellant, v. The COUNTY OF LEWIS AND CLARK, a Political Subdivision of the STATE OF MONTANA, Defendant and Respondent, and the STATE OF MONTANA and the STATE BOARD OF EQUALIZATION of the State of Montana, Intervenors and Respondents.

No. 9272.

Submitted January 11, 1955.   Decided June 17, 1955
As Amended on Denial of Rehearing June 30, 1955.
284 Pac. (2d) 1012.

C. E. Pew, Helena, for appellant.

Arnold H. Olsen, Atty. Gen., Vera Jean Heckathorn, Asst. Atty. Gen., H. O. Vralsted, Chief Tax Counsel, Bd. of Equalization, and Sp. Asst. Atty. Gen., and Lyman J. Hall, Deputy Tax Counsel, Helena, for respondent.

Mr. Pew and Mr. Vralsted argued orally.

MR. JUSTICE DAVIS:

The appellant as plaintiff brought this action in the district court for Lewis and Clark County against the respondent county as defendant to recover certain taxes for the year 1949 demanded under R. C. M. 1947, sections 84-5406, 84-5409, and paid under protest. The state and the state board of equalization intervened to join with the county in a general demurrer to the appellant's amended complaint. This demurrer was sustained. Judgment of dismissal followed. From that judgment this appeal has been taken.

Hereafter reference to the parties will be made as in the court below.

The only question for determination is whether the amended complaint states a cause of action for the recovery of the challenged taxes. We agree with the district court that it does not and therefore affirm its judgment.

Summarized the amended complaint and the exhibit thereto annexed set forth these pertinent facts: The plaintiff as lessor gave Swansea Mines, Inc., its lessee, a lease and option of date October 6, 1942, on certain of its mining claims in Lewis and

Clark County. Under this lease the lessee operated the mines on these claims during 1949 at a net loss, but as stipulated in the lease paid the plaintiff certain percentages of its net smelter returns from its operations for that year amounting to $1,516.05, which in accordance with the option given to purchase the demised claims were to be "credited as payments upon the unpaid balance" of the agreed purchase price of $45,000. This royalty, as the amended complaint describes these net smelter returns, the defendant board assessed at the full cash value of the amount paid the plaintiff. Upon the basis of this assessment the treasurer of the defendant county demanded a tax of $98.24, which was paid under protest.

Recovery of this tax is prayed upon the ground that it contravenes sections 1, 3, and 11 of "Article XII of the Constitution of the State of Montana, and violates the provisions of the first subdivision of the Fourteenth Amendment to the Constitution of the United States", (1) because "said Chapter 54 [R. C. M. 1947, sections 84-5401 to 84-5415, both inclusive], to the extent that it may be construed as requiring the payment of the tax so levied upon said royalty where such royalty is not a part of net proceeds from the production of metals or other minerals, is in contravention of said constitutional provisions above mentioned", and (2) because the "royalty so paid to plaintiff by said Swansea Mines, Inc., is not a part of net proceeds of any operation of any mine, but is simply based upon the amount of net smelter returns."

The case thus made and submitted presents for decision the narrow question whether the state and county proceeding under sections 84-5406, 84-5409, supra, may tax as royalties the plaintiff's share of the net smelter returns coming to it for the year 1949 from the operations of its lessee on the leased claims, although the operator itself realized no net proceeds within the meaning of our Constitution and statutes.

Reserving for consideration later the question of the constitutionality of these statutes, we think the problem here would not be difficult of solution, if there were in the record the usual

mining lease by the mine owner as lessor to its lessee as the operator with the stipulation that anually the owner should have from the operator a specified share of the minerals produced in kind or in cash. The owner would then take from the operator what certainly is a landowner's royalty (and here we speak of no other) within the definition of that word which this court has heretofore laid down and to which other courts pretty generally adhere.

The tax laid by the statutes cited would then certainly be due in any case where there were net proceeds realized by the operator equal to, or greater than the royalties so paid; and this is the case we shall first consider. Compare Bryne v. Fulton Oil Co., 85 Mont. 329, 333, 336, 278 Pac. 514.

For then the owner would have not only a part of the operator's net proceeds, but also a share of the product or profit of the mines leased paid for permitting the operator to use its property, which is a true landowner's royalty. Homestake Exploration Corp. v. Schoregge, 81 Mont. 604, 615, 264 Pac. 388; Marias River Syndicate v. Big West Oil Co., 98 Mont. 254, 264, 38 Pac. (2d) 599; Hinerman v. Baldwin, 67 Mont. 417, 432, 215 Pac. 1103; Santa Rita Oil & Gas Co. v. State Board of Equalization, 101 Mont. 268, 289, 54 Pac. (2d) 117; Patterson v. Texas Co., 5 Cir., 131 F. (2d) 998, 1001; Bellport v. Harrison, 123 Kan. 310, 312, 313, 255 Pac. 52; Indiana Natural Gas & Oil Co. v. Stewart, 45 Ind. App. 554, 560, 90 N. E. 384; Kissick v. Bolton, 134 Iowa 650, 652, 112 N. W. 95; Palmer v. Crews, 203 Miss. 806, 818, 35 So. (2d) 430, 4 A. L. R. (2d) 483; Koppers Coal Co. v. Alderson, 125 W. Va. 747, 753, 26 S. E. (2d) 226; Miller v. Carr, 137 Fla. 114, 122, 123, 124, 125, 188 So. 103; Saulsberry v. Saulsberry, 162 Ky. 486, 488, 172 S. W. 932, Ann. Cas. 1916E, 1223; 40 C. J., Mines and Minerals, section 632, page 1027; 58 C. J. S., Mines and Minerals section 185, pages 396, 397; 77 C. J. S., Royalty or Royalties, pages 542, 543.

Moreover, in determining whether under the lease at bar the net smelter returns paid the plaintiff are taxable consistent with our statutes as royalties we must construe the provisions

of that instrument for what they really are, "regardless of the designation given by the parties." Forbes v. Mid-Northern Oil Co., 100 Mont. 10, 20, 45 Pac. (2d) 673, 678. In other words, we are not bound to accept at its face value the stipulation of the lessor and lessee that the net smelter returns paid over are "not royalties but are payments upon the purchase price for said mining claims and appurtenances," etc.

It follows then that the application of the statutes (sections 84-5406, 84-5409, supra), as they are written, to the net smelter returns which the plaintiff receives under this lease, if paid out of the operator's net proceeds, is as clear and as certain as language can record the legislative intent. For they are royalties fairly within the definition of that term as we have defined it above, and are therefore under the applicable statutes to be "taxed on the same basis as net proceeds of mines are taxed as provided by [R. C. M., 1947] section 84-301."

Nor do we think the case altered by the peculiar stipulations of the agreement of October 6, 1942. We have here (1) a true lease coupled with (2) a continuing offer (option) by the owner-lessor to sell for the price of $45,000, which may only be accepted by the payment in full of that sum. Then and not until then is a unilateral contract closed with the owner such that it is bound to convey. See Ide v. Leiser, 10 Mont. 5, at page 11, 24 Pac. 695, 24 Am. St. Rep. 17, and Thomas v. Standard Development Co., 70 Mont. 156, at page 171, 224 Pac. 870.

The term of this lease is defined (1) in paragraph 4, viz., "* * * so long as it [the operator-lessee] shall keep, observe and perform all of the terms and conditions hereof on its part, * * *"; and (2) by paragraph 9, which provides for the delivery of deeds conveying the described mining claims to the lessee upon the "payment in full to first party [plaintiff] of the balance of said purchase price in accordance with the terms of this agreement."

The obligation to pay the stipulated percentages of the net smelter returns is coextensive with the term thus limited by the lease, and ceases only when the term itself ends; i. e., upon the

delivery of the deeds mentioned or the cancellation theretofore of the leasing for the lessee's default.

In this particular the net smelter returns paid the plaintiff differ not at all from the royalties paid the landowner under the familiar oil and gas lease given for a term of ten years and as long thereafter as oil or gas is produced. There too the royalty is coextensive with the term, because it is paid until the lease ends when the deposit of oil and gas is exhausted or the lessee defaults and forfeits the leasehold. No one denies that under such a lease the landowner receives a royalty taxable under our statutes.

No rent is reserved *eo nomine* under the agreement of October 6, 1942; but that is immaterial, if that leasing is supported otherwise by a sufficient consideration. State v. McCombs, 156 Kan. 391, 401, 402, 133 Pac. (2d) 134; Ault Woodenware Co. v. Baker, 26 Ind. App. 374, 58 N. E. 265; Bachenheimer v. Palm Springs Management Corp., 116 Cal. App. (2d) 580, 591, 254 Pac. (2d) 153; Huus v. Ringo, 76 N. D. 763, 772, 39 N. W. (2d) 505; Barnett v. Lincoln, 162 Wash. 613, 618, 299 Pac. 392; Wilcox v. Bostick, 57 S. C. 151, 35 S. E. 496. To read the various covenants of the lease on the part of the operator-lessee is to spell out a consideration more than sufficient to sustain it.

So also it is immaterial that in essence the term of this lease depends upon the will of the operator-lessee. It is nonetheless a lease that it terminates when the lessee fails to perform with no other liability incurred than forfeiture and the obligation to pay over to the lessor any sums accruing to it under the agreement. Dubois v. Gentry, 182 Tenn. 103, 184 S. W. (2d) 369; Myers v. Kingston Coal Co., 126 Pac. 582, 601, 17 A. 891; Kelleher v. Fong, 108 Me. 181, 79 A. 466; 51 C. J. S., Landlord and Tenant, section 215, page 820; 35 C. J., Landlord and Tenant, section 406, page 1151.

Nor is it material that the owner as lessor reserves to itself the ownership of no part of the production had by the lessee, that all the ores and other minerals produced belong to the latter,

subject to its obligation to turn over to the lessor the stipulated percentages of the "net smelter returns". Even so, this court has heretofore held that such a share of the production of the property leased falls fairly within the definition given of a royalty in the citations above, and is accordingly taxable under statutes substantially like sections 84-5406, 84-5409, supra, where on the facts it is not questioned that there are net proceeds within the meaning of Article XII, section 3, of the Constitution of this state. See Byrne v. Fulton Oil Co., 85 Mont. 329, 335, 336, 278 Pac. 514, construing Homestake Exploration Corp. v. Schoregge, 81 Mont. 604, 264 Pac. 388; Northern Pacific Ry. Co. v. Musselshell County, 96 Mont. 544, 548, 32 Pac. (2d) 1.

The next question then on this branch of the case is: Are these net smelter returns any the less royalties taxable to the plaintiff as the royalty owner under the cited sections of our Codes, because by their agreement of October 6, 1942, the parties have chosen to apply them upon the stipulated purchase price of $45,000? We think not.

These smelter returns, which are credited by the owner as payments upon the purchase price after it has received them (as the case must be), are yet in their origin nothing but net smelter returns, i. e., a share still of the product of the mines in question paid over for the privilege of mining on the plaintiff's claims. For it will not be denied, we believe, that in any case if these payments are not made, the operator-lessee's right to mine is subject to forfeiture by the terms of the lease. The further stipulation of the agreement that they are to be applied on the purchase price after payment in no manner alters the fact that, unless paid, the operator's privilege ceases at the owner's election.

We think this result in case of nonpayment would be self-evident, if the plaintiff's offer to sell were embodied in a separate instrument wholly apart from the lease. That both the lease and the option are found in the same instrument cannot blunt the fact that the legal effect of the one is to lease the described claims, of the other to sell them.

The lease in the agreement of October 6, 1942, requires the payment of a percentage of the net smelter returns as the price of the privilege thereby given the lessee to mine upon the claims leased. These net smelter returns are then royalties in every sense of that word.

And they do not become purchase moneys under that agreement, until, after payment over as royalties, they have been applied upon the contract price under the terms of the offer to sell. That the parties have chosen to credit these royalties then upon the purchase price of the claims, which the lessee at its option may buy, cannot for that reason deprive the state of its right to tax the royalties for what they really are when received by the owner, who may never be called upon to convey at all.

And we believe there would be no argument *contra,* if the parties here had stipulated, for example, that after receiving these net smelter returns the plaintiff should forthwith pay them to one of its creditors for application upon a corporate debt incurred under a different and separate instrument made between it and Swansea Mines, Inc. This case put can not be distinguished from the case at bar.

Our position here is reinforced by the general rule that a ██ ''law established for a public reason cannot be contravened by a private agreement.'' R. C. M. 1947, section 49-105; Commercial Credit Co. v. O'Brien, 115 Mont. 199, 216, 146 Pac. (2d) 637; Forbes v. Mid-Northern Oil Co., 100 Mont. 10, 22, 45 Pac. (2d) 673; Byrne v. Fulton Oil Co., 85 Mont. 329, 338, 278 Pac. 514; Hames v. City of Polson, 123 Mont. 469, 480, 215 Pac. (2d) 950.

The plaintiff as the owner and lessor and the operator as lessee can by no contract between them make royalties, which are in truth such, exempt from taxation by the expedient of calling them either purchase money, or payments upon the plaintiff's corporate indebtedness, or contributions made by the plaintiff for charitable purposes. These net smelter returns or royalties, after payment to the plaintiff, are indeed purchase moneys between the parties to the agreement of October 6, 1942. They are

nevertheless royalties between the plaintiff and the state, which is no party to that agreement, and is not bound by it. We conclude therefore that these net smelter returns may then be taxed as royalties, even though applied as payments upon the purchase price of the described claims; certainly where they are paid out of the operator's net proceeds. To construe the controlling facts and the statutes otherwise would mean that we were to deny words plainly written their accepted meaning.

Nor is the case altered in the least, if we apply the rule of Vennekolt v. Lutey, 96 Mont. 72, 77, 28 Pac. (2d) 452; and Shubat v. Glacier County, 93 Mont. 160, 164, 165, 18 Pac. (2d) 614, and accordingly construe these statutes strictly in favor of the taxpayer. As so construed we reach the same conclusion.

Opposed to this conclusion is the argument made primarily upon the text of Thornton, Oil and Gas (Willis), 5th Ed., section 363, page 644, and section 390, page 688, to the general effect that "whatever would not be a 'rent' cannot be a 'royalty,' but must be 'purchase money' ", which is undoubtedly true. We have pointed out above, however, that at bar on this appeal we do have to begin with a true landowner's royalty, which in itself makes this citation pointless.

But we would go further to make it plain that this authority nowhere even intimates that the converse of the quoted statement is in any part true, viz., that "purchase money" may not be made up of landowner's royalties as well as, for example, wages, dividends, interest, capital gains, and other kinds of income or capital. Indeed, the converse could not be stated upon the support of the decided cases collected in note 180 at page 688, Volume 2, of the treatise above, upon which the author bottoms his text.

For none of these decisions hints that what are in essence landowner's royalties may not also be used as purchase moneys, provided the parties so agree. To be specific: none of these decisions suggests that what is a landowner's royalty may not also be "credited as payments upon the unpaid balance of the

purchase price'' of the claims described in the agreement before us of October 6, 1942; and such is, we note, the express language of that agreement. To speak of these credits as ''purchase money'' is to paraphrase what the instrument itself really stipulates.

Further, at least some of the citations, upon which the cited text stands speak directly and expressly of royalties which by the agreement of the parties actually become purchase moneys. See Fairchild v. Fairchild, 6 Sadler, Pa. 231, 9 A. 255; Duff's Appeal, 10 Sadler, Pa. 483; 14 A. 364, 21 Weekly Notes of Cases 491; Williamson v. Williamson, 223 Ky. 589, 592, 4 S. W. (2d) 392, etc. Compare also National Coal Co. v. Overholt, 81 W. Va. 427, 94 S. E. 735; Hobart v. Murray, 54 Mo. App. 249. At most those of these decisions which do not mention landowner's royalties as such stand only for the proposition that an owner may, if he chooses, sell outright the minerals under his land for a price, which is to be paid in installments measured wholly or in part by the quantities actually mined and removed during a specified period, and this without bargaining for any specified share in the minerals so produced or of the profits so realized. Compare Manning v. Frazier, 96 Ill. 279.

But such a holding is not a rule that if vendor and purchaser agree to credit royalties, received as such by the vendor, upon the purchase price of minerals in place or of described mining claims, the essential characteristics of the royalties themselves are in any manner altered or destroyed. Neither the text of Thornton, Oil and Gas (Willis), supra, nor any other authoritative writer or decided case, to which our attention has been directed, so holds. The plaintiff's contention that its percentages of the net smelter returns are not royalties, because they are credited as purchase moneys, does not withstand analysis.

So also of the further contention that our conclusion above is vulnerable, because assignments by the operator or lessee of specified percentages of the net smelter returns to apply (1) upon the purchase price of machinery bought, (2) upon grocery bills incurred, and (3) upon an indebtedness due other suppliers

would make these creditors the owners likewise of royalties or net proceeds taxable under our statutes equally with those paid to the mine owner under his lease. This suggestion is without merit.

For we note again and with emphasis that on this appeal we are concerned only with what is known as a landowner's royalty. In the cases last put by hypothesis we have something else. The merchant sells the lessee or operator mining machinery; the grocer, sugar and flour; the "other suppliers", the wares and particular merchandise in which each deals; but no one of them gives the lessee, as does the mine owner for his share of the net smelter returns paid him, the right to mine or use the demised claims. Conversely, stated, the mine owner unlike the dealer in mining machinery, the grocer, and the other merchants who supply its operating needs grants the operator-lessee the privilege of mining upon, and using the owner's real estate, which produces the net smelter returns paid to the owner for that specific privilege. It is just the right given by the owner to the operator, which stamps the payments made to him from the net smelter returns as royalties within the definition above.

Precisely because the percentages of the net smelter returns paid over to the machinery dealer, the grocer, and the "other suppliers" are so paid for something entirely different than that which the landowner gives, they are not landowner's royalties and are not therefore taxable as such. Whether these payments received by those who supply the operator with machinery, groceries, and like necessities are some other kind of royalty or not royalties at all is beyond the scope of our inquiry on this appeal.

For present purposes it is enough that the plaintiff takes a landowner's royalty by its lease and agreement of October 6, 1942, which is accordingly taxable under sections 84-5406, 84-5409, supra, that those who supply the operator with machinery, groceries, and other supplies for a percentage of the net smelter returns stand each in an entirely different relation both to the mine leased and to the operator-lessee, and that even though the returns coming to them prove to be wholly exempt from tax-

ation (which we do not decide), there is shown thereby nevertheless no good reason why the plaintiff should be forgiven a tax plainly demanded of it in our view by the applicable statutes.

Thus we come to the final contention of the plaintiff's counsel that as we have construed and applied sections 84-5406, 84-5409, supra, they are unconstitutional because of sections 1, 3 and 11, Article XII, of the State Constitution where as here the lessee admittedly realized no net proceeds itself from its mining operations during 1949.

First, of section 3, Article XII, supra. The short answer to the argument that this section is contravened is found in the opinions of this court in Tong v. Maher, 45 Mont. 142, 122 Pac. 279; Homestake Exploration Corp. v. Schoregge, supra, 81 Mont. at pages 618, 619, 264 Pac. at page 393; and Byrne v. Fulton Oil Co., supra, 85 Mont. at page 335, 278 Pac. at pages 517, 518, as extended and applied by Mr. Justice Angstman in his concurring opinion written in Northern Pacific Ry. Co. v. Musselshell County, 96 Mont. 544, 550, 32 Pac. (2d) 1. With this opinion the majority of this court did not disagree. They decided the case on other grounds.

What Mr. Justice Angstman said there is then not only in point, but is also in no wise contradicted or disputed by anything written elsewhere in our opinions. We quote shortly what is directly applicable at bar, 96 Mont. 550, 32 Pac. (2d) 3: ''* * * That question [for decision] is whether plaintiff is liable for a net proceeds tax on the proceeds yielded to it as royalty on its royalty interest in a mine, when such royalty is no part of the net proceeds from the operation of the mine by the operator. Under section 3, article 12, of our Constitution, 'the annual net proceeds of all mines and mining claims shall be taxed as provided by law.' Chapter 133, Laws of 1931, provides that the product yielded to a royalty interest 'shall be deemed a part of the net proceeds of a mine or mines and shall be taxed on the same basis as net proceeds of mines are taxed.' It is plain that under this statute it matters not whether the mine is oper-

ated at a profit or at a loss by the operator, so far as the royalty holder is concerned. He must pay on the royalty yielded to him whether the operator of the mine operated it at a loss or not.''

Here the rule controlling at bar is stated. The quotation above from Mr. Justice Angstman's special concurrence in Northern Pacific Ry. Co. v. Musselshell County, supra, we adopt as decisive on this appeal that section 3, Article XII, of our Constitution is not violated by the tax which is imposed upon the plaintiff landowner's royalties under the challenged statutes. Although Swansea Mines, Inc., the operator, may have lost money during 1949, the plaintiff surely did not. Although Swansea Mines, Inc., realized no net proceeds for taxation, the plaintiff mine owner did. The moneys paid it under the agreement of October 6, 1942, from the net smelter returns produced by the operator, less only those deductions which the legislature may allow, are taxable net proceeds to the mine owner within the meaning of section 3, Article XII, supra. Accordingly the plaintiff as the mine owner is rightly taxed upon these royalties construed as its net proceeds for 1949.

Any other construction would deny the plain language of the State Constitution and of our Codes its plain application to a species of property which certainly is taxable under some statute. Compare section 16, Article XII, Montana Constitution. It does not matter whether the operator under R. C. M. 1947, section 84-5403, subd. 1, did or did not deduct these royalties in making up its return for the computation of its 1949 net proceeds as its lease with the plaintiff required. Whether these royalties were included in this return or omitted therefrom is no business of the state. The taxing officers of the state are required to tax the plaintiff's net smelter returns for what they are, not for what the parties may do with them.

Likewise it is of no moment that the decisions of this court, which we have noted last above, have construed different statutes perhaps than sections 84-5406, 84-5409, supra, as they read today. The reasoning of those cases is both persuasive and in point in our consideration of the provisions of our Codes pres-

·ently before us, precisely as that reasoning was decisive of our construction of the former statutes with which our earlier de·cisions were concerned. The extension of the doctrine of these decisions to the case at bar is both logical and consistent with Article XII, section 3, of the Constitution of Montana. It was foreshadowed by Mr. Justice Angstman's opinion in Northern Pacific Ry. Co. v. Musselshell County, supra. The tax which we sustain here upon the plaintiff's net smelter returns ac·cordingly does not offend against our Constitution in the particular just considered.

There remain for consideration the claimed violations of Article XII, sections 1 and 11, of the State Constitution and ·of the Fourteenth Amendment to the Federal Constitution. The premise of the plaintiff's argument at this point is (1) that these constitutional provisions require the assessment for taxation and the taxation of property, which belongs to the same general class, at a uniform rate; (2) that sections 84-5406, 84-5409, supra, as we have construed and applied them, assess for taxation and tax the moneys which the plaintiff receives as its royalties at one hundred per cent of their full and true value under Class One of R. C. M. 1947, sections 84-301, 84-302, not·withstanding that other moneys and credits fall into Class Five under these statutes and are accordingly taxed at only seven per cent of their full and true value. Hence it is said there re·sults that lack of uniformity in the assessment and taxation of property of the same class and kind, which both the State and Federal Constitutions forbid. We do not think so upon the foundation of this record.

The conclusion which we have reached under Article XII, section 3 of the State Constitution that the plaintiff's percent·ages of the net smelter returns paid it under its lease are net proceeds as to it, taxable as royalties perforce of sections 84-5406, 84-5409, supra, disposes without more of this further claim of unconstitutionality as far as the amended complaint at bar discloses. For if these royalties are net proceeds as we have held, they properly may be put with other net proceeds in Class One

of sections 84-301, 84-302, supra, and so assessed for taxation at a higher and different rate than other moneys and credits. There is then no unconstitutional discrimination. Hilger v. Moore, 56 Mont. 146, 182 Pac. 477; Bank of Miles City v. Custer County, 93 Mont. 291, 19 Pac. (2d) 885.

If on the other hand there are facts which take the plaintiff's ▮▮▮ royalties out of the general rule that inasmuch as they are net proceeds to it, they may constitutionally be classified and taxed with other net proceeds from mines and mining claims, the amended complaint does not disclose any such case. The facts must be set out with particularity to raise the question. Public Service Commission of Montana v. Great Northern Utilities Co., 289 U. S. 130, 136, 137, 53 S. Ct. 546, 77 L. Ed. 1080; Aetna Insurance Co. v. Hyde, 275 U. S. 440, 447, 48 S. Ct. 174, 72 L. Ed. 357; Corporation of Presiding Bishop, etc., v. City of Porterville, 90 Cal. App. (2d) 656, 660, 203 Pac. (2d) 823; Schueller v. Road Improvement District No. 4, 149 Ark. 670 (memo), 234 S. W. 615; Board of Zoning Appeals v. Waintrup, 99 Ind. App. 576, 587, 193 N. E. 701; Quinn v. Johnson, Tex. Civ. App., 91 S. W. (2d) 499, 502; Peverill v. Board of Supervisors, 201 Iowa 1050, 1056, 205 N. W. 543; Hutchens v. Jackson, 37 N. M. 325, 337, 338, 23 Pac. (2d) 355; State ex rel. Wolfe v. Missouri Dental Board, 282 Mo. 292, 302, 303, 221 S. W. 70; Rose Theatre, Inc., v. Lilly, 185 Ga. 53, 193 S. E. 866; Corn v. Fort, 170 Tenn. 377, 399, 95 S. W. (2d) 620, 106 A. L. R. 647.

This the plaintiff has not done. Its amended complaint shows only that the operator for 1949 realized itself no net proceeds. This is not enough. On the face of that complaint and of the statutes of the state classifying the plaintiff's royalties for assessment and taxation as the net proceeds of "all mines and mining claims" are assessed and taxed the claim of an unconstitutional lack of uniformity is without merit as our decisions cited heretofore have held.

We will not say with finality that no case can be stated which would show an unconstitutional classification of a royalty for

the purposes of taxation with the net proceeds of mines and mining claims as those words are defined in our Codes. We say merely that here the plaintiff has not put any such case.

The judgment below is affirmed.

MR. CHIEF JUSTICE ADAIR, and MR. JUSTICES ANDERSON and BOTTOMLY, concur.

MR. JUSTICE ANGSTMAN, (dissenting).

I think the opinion prepared by Mr. Justice Davis is erroneous in holding that the payments made to plaintiff constitute royalties taxable as net proceeds.

A copy of the agreement between plaintiff and Swansea Mines, Inc. was attached to the complaint and made a part of it. By its terms Swansea Mines, Inc. was given the exclusive right to purchase the mining claims described. The purchase price was fixed by the agreement at $45,000 of which $5,481.31 had already been paid when the agreement was made, leaving a balance due of $39,518.69.

Swansea Mines, Inc. was to make payments to the plaintiff out of the net smelter returns, which varied in percentage according to the value of the ore shipped. The contract contained this significant provision: "The payments hereinabove provided for are not royalties but are payments upon the purchase price for said mining claims and appurtenances, and second party [Swansea Mines, Inc.] in making its return of net proceeds from operations hereunder to the Board of Equalization of the State of Montana shall not include any of such payments as royalty deductions in such returns."

I think we must take the contract as it is written and as meaning what it says. The payments made to plaintiff are not royalty but constitute a part of the purchase price of the mine. That being so, the interest of plaintiff was and is not a royalty interest.

Thornton on Oil and Gas, Vol. 2, section 363, page 644, recognizes the distinction between royalty and purchase money.

He there states: "In the discussion hereafter a distinction will be drawn between 'rent' as such and 'purchase money' under an instrument selling mineral and oil beneath the surface of a specified tract; and in such an instance whatever would not be a 'rent' cannot be a 'royalty' but must be 'purchase money'." And on page 688, section 390, the same author says: "The consideration of a lease or an instrument giving a right to take mineral, oil or gas from the premises, may not be rent at all, but purchase money for the mineral or oil taken out of the earth. Thus where the owner of land sold all the mineral under it, granting to the vendee the right to enter on the premises and dig, explore therein, and occupy them with all necessary structures, and mine and remove all coal, paying to the vendor a certain price per ton of coal removed, payable quarterly, it was held that the stipulated price was purchase money of the real estate, not of the mineral removed, for which the vendor had a lien on the coal not mined and removed, the payment of so much per ton being only a mode of determining the amount of the purchase money to be paid."

It is to be noted that plaintiff does not receive its percentage of the net smelter returns for an indefinite period. It receives it for a limited time only, that is, until the purchase price of the mines is paid. When the purchase price is paid plaintiff has no further right or interest in the real estate. I am aware that ordinarily royalty is a share of the product or profit paid to the owner of land for permitting the operator to use his property. But here the amount is paid not for permitting the use of the property but for the purchase price thereof.

The agreement between the parties to the effect that the payments are not royalties but purchase price was not and is not opposed to public policy. In substance it is equivalent to an agreement that if the percentage of net smelter returns paid to plaintiff as purchase price of the mines is taxable as net proceeds, then the operator, Swansea Mines, Inc. would pay the tax thereon.

Agreements with respect to taxes are frequently made be-

tween buyer and seller. I concede that such agreements are not binding on the State. Hence we must still determine whether plaintiff is in fact the owner of a royalty interest. The nature of the payments, i. e., whether they constitute royalties, must be determined from all the circumstances under which they are made rather than by the name by which they were called. Soderquist v. Glander, 156 Ohio St. 287, 102 N. E. (2d) 465.

It is my view that the $1,516.05 was purchase money and not royalty. The fact that it is purchase money is shown by the statement of both the owner and operator in the agreement, as well as by the other terms of the agreement, showing the purpose of the payments.

Furthermore, if the sums here in question may be treated as royalty in a certain sense, they are not royalties within the meaning of R. C. M. 1947, section 84-5406, relating to the taxation of royalties as net proceeds of a mine. Only royalties which constitute an interest in mining property are assessable and taxable on the basis of net proceeds. Section 84-5406 was enacted after this court gave the legislature the green light in the case of Homestake Exploration Co. v. Schoregge, 81 Mont. 604, 264 Pac. 388, 393, to tax separate interests in mining property to the several owners of each interest, where this court said: "* * * the separate interests which different persons may own in the same property is properly assessable and taxable to the true owner of the particular interest, and it is unlawful to tax a person for property he does not own." That principle was reaffirmed in the case of Byrne v. Fulton Oil Co., 85 Mont. 329, 278 Pac. 514, and recognized in Northern Pacific Ry. Co. v. Musselshell County, 96 Mont. 544, 32 Pac. (2d) 1. The constitutional method of taxing mines on the net proceeds is a substitute for or a tax in lieu of the ad valorem tax on the value of the mine or mining interest. Byrne v. Fulton Oil Co., supra, and cases therein cited on the point. Unless a royalty represents an interest in the real estate it is not taxable and there can be no substituted method of taxing by assessing the net proceeds.

A royalty interest in order to be assessable under R. C. M.

1947, section 84-5406 on the net proceeds yielded to it must be an interest in a mine. That is the only interest that it is permissible to tax under section 3 of Article XII of our Constitution. If we are here dealing with a royalty in any sense, it certainly cannot be said that it represents any certain interest in real property, or, if so, what that interest is. Under the contract plaintiff obtains five per cent of the net smelter returns which have an average gross value of not exceeding $8 per ton; it gets ten per cent of the smelter returns having a gross value in excess of $8 per ton and not exceeding $20 per ton; it gets 15 per cent of the net smelter returns when the gross value is in excess of $20.00 and not in excess of $40.00 per ton; it gets 20 per cent of the net smelter returns which have a gross value in excess of $40.00 and not in excess of $60.00 per ton; it gets a 25 per cent of the net smelter returns having a gross value in excess of $60.00 per ton. It likewise gets 10 per cent of the net smelter returns on all concentrate or bullion derived from crude ore, which will have an average gross value in excess of $8.00 per ton.

Hence, no one can read the contract and ascertain what interest in the land, if any, the plaintiff retained if that interest be classified as a royalty interest. As before stated, I believe that the royalty interest may not be taxed under section 4 of Article XII of the Constitution, unless that royalty interest be a definite interest in a mine. The provisions of our Constitution are both mandatory and prohibitory, unless declared to be otherwise. Sec. 29, Art. III. Unless a royalty constitutes an interest in a mine, it cannot be taxed under section 4 of Article XII on the net proceeds. Wherever this court has sustained a tax against the royalty interest it has been when that interest constituted an interest in the real estate. Compare Forbes v. Mid-Northern Oil Co., 100 Mont. 10, 45 Pac. (2d) 673; Willard v. Federal Surety Co., 91 Mont. 465, 8 Pac. (2d) 633, and Northern Pacific Ry. Co. v. Gas Development Co., 103 Mont. 214, 62 Pac. (2d) 204. On this point I see no difference in principle between this case and one in which the operator of the mine

makes an assignment of net smelter returns varying in percentage according to the value of the ore, to secure a merchant for furnishing groceries. Certainly the merchant would have no interest in the real estate and no interest in the mine.

Likewise, if we treat those payments as installments on the purchase price of the mine, as I think we must, then the tax here imposed results in a lack of uniformity of assessments upon the same class of subjects contrary to Article XII, sections 1 and 11 of our Constitution, and contrary to the Fourteenth Amendment to the Constitution of the United States.

One person may sell his mine for $45,000 in cash. If the transaction is completed after the first Monday in March he pays no tax whatever on the $45,000 for that year. If the transaction be made before the first Monday in March he pays only on a seven per cent valuation, R. C. M. 1947, section 84-302, since it comes under Class 5 of section 84-301. Another person may sell his mine for $45,000 to be paid by a percentage of net smelter returns as here. If the smelter returns be considered as royalty and subject to a net proceeds tax, then it would carry a 100 per cent valuation for tax purposes as soon as paid. The unconstitutional discrimination is patent.

In my opinion where the net smelter returns become the means of measuring the periodical installments on the purchase price of a mine, as here, they are not to be considered as royalty or net proceeds and are not subject to the provisions of the law treating of the taxation of net proceeds from royalty interests.

I think the court erred in sustaining the demurrer to the complaint and in entering the judgment of dismissal and that the judgment should be reversed.